1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,              No.  2:13-cr-00054 (KJM)

12                    Plaintiff,

13        v.                                 ORDER

14   MARLON WASHINGTON,

15                    Defendant.

16

17

18              Defendant Marlon Washington was one of nine men arrested and indicted in a

19   reverse sting operation designed to capture drug stash house burglars.  The matter is before the

20   court on Washington's motion to dismiss the indictment for outrageous government conduct.

21   Mot., ECF No. 257 at 1–2.  The government opposes the motion, ECF No. 265, and Washington

22   has replied, ECF No. 266.  As announced from the bench on September 9, 2015, and explained

23   below, the motion is DENIED.

24   /////

25   /////

26   /////

27   /////

28   /////

                                          1

I.      BACKGROUND

A.      Factual Background

1.      Initiation of Reverse Sting Operation (Unrecorded)

In January 2013, the Bureau of Alcohol, Tobacco, and Firearms (ATF) initiated a reverse sting operation in Stockton, California to apprehend cocaine stash house robbery crews.[1] Opp'n Ex. A at A-1, ECF 265-1.  As part of the operation, a confidential informant (CI) for the ATF approached a man named Kireston Harper (aka K-Stack) at a Stockton strip club.  Gov't Disc. at 1; Mot. at 5; Opp'n at 1.[2]  The initial contact between the CI and Harper was not recorded with audio or video.  Mot. at 5–6; *see* Opp'n at 1–2.  The CI asked about Harper's ability to obtain drugs or guns or both.  Gov't Disc. at 1; Mot. at 5; Opp'n at 1.  At some point in the conversation, Harper asked if the CI "knew of any 'licks' he and his associates could execute." Finney Aff. ¶ 5.  "Licks" is slang for robberies.  *Id.*  The CI told Harper he or she could introduce him to someone, namely, Agent Zayas, the ATF's undercover agent (UC), who had information about a potential robbery.  Gov't Disc. at 1; Mot. at 6; *see* Opp'n at 1–2.  In the initial report Agent Zayas filed on the meeting between CI and Harper, he never describes Harper as someone involved with home invasion robberies.  Gov't Disc. at 1; Mot. at 6.  However, a DEA application for a search warrant drafted by Agent Renee Finney on August 14, 2013 states the CI described Harper to Agent Zayas as someone "involved in home invasion robberies."  Finney Aff. ¶ 5.

2.      Post-Initiation Meetings (Recorded)

Agent Zayas arranged meetings on January 28, 29, and 31, 2013, with Harper and a robbery crew Harper assembled.  Each meeting was video and audiotaped.  Finney Aff. ¶¶ 7, 12, 14.  Defendant Washington was present at each meeting.  *Id.*  During the meetings, Agent

_____

[1] In a "reverse sting" operation, the government sets up a fictitious crime and arrests participants as they begin to carry out what the participants believe is a real crime. *United States v. Black*, 733 F.3d 294, 297 n.1 (9th Cir. 2013).

[2] Defendant's motion to dismiss included several references to the government's discovery and audio files.  The government's opposition disputes none of the facts.

1  Zayas pretended to be a disgruntled cocaine courier recruiting help to steal cocaine from a stash

2  house controlled by his drug boss.  *See id.*

3        After hearing the robbery proposal at the first meeting, Harper said, "you ain't got

4  to say no more."  *Id.* ¶ 7.  Agent Zayas told Harper he was nervous, and Harper assured him he

5  had "nothing to worry about."  *Id.*  Harper told Agent Zayas he was going to take the cocaine with

6  him when he returned to Chicago in two weeks.  *Id.* ¶ 8.

7        During the meetings, Agent Zayas told Harper's crew two men guarded the stash

8  house, at least one of whom would be armed.  *Id.*  During the January 29 meeting, Agent Zayas

9  said he had never seen the second man with a gun, "but he might have a gun on him right now."

10  *See* Mot. at 8 (quoting Audio File 153); *see also* Finney Aff. ¶¶ 8–9.  Harper said he expected

11  four men would guard the stash house, but "two, that's even better, I'm going to keep it solid,

12  that's even better."  Finney Aff. ¶ 8.  Agent Zayas said when he previously picked up cocaine

13  from the stash house, he had seen seven to ten kilograms of cocaine.  Mot. at 12 (quoting Gov't

14  Disc. at 309–10); Opp'n at 2; *see also* Finney Aff. ¶ 10.  Zayas said the cocaine was pure.  Finney

15  Aff. ¶ 10.  He offered to split it "50-50" with Harper.  *Id.*

16        Agent Zayas asked Harper if he needed a car for the robbery, but he said no, "I'm

17  ready, all you got to do is tell me when you ready to go."  Mot. at 9 (quoting Audio File 153);

18  Opp'n at 3.  Harper told Agent Zayas to leave the door unlocked after he entered the stash house.

19  *See id.*  Harper said he would push Agent Zayas to the floor as his crew entered the house behind

20  him.  Finney Aff. ¶ 13.  Agent Zayas said, "These guys ain't clowns, they're older cats like me,

21  but I ain't got no love for these guys, you guys do what you're going to do . . . ."  Mot. at 9

22  (quoting Audio File 153).  Agent Zayas asked Harper if everything was good, and Harper replied,

23  "Everything good on this half."  Finney Aff. ¶ 13.

24          3.    Day of Arrest (Recorded)

25        On February 1, 2013, the CI called Harper and told him to meet at the Home

26  Depot in Stockton.  *Id.* ¶ 16.  The call and the meeting were recorded.  *Id.* ¶¶ 7, 20.  The robbery

27  crew arrived in three cars: a Toyota, Chevy, and Honda.  *Id.* ¶ 18.  Harper was in the Toyota.  *Id.*

28  Defendant Washington stayed in his car, the Honda, for the duration of the meeting, until he was

1   arrested later that day.  Mot. at 11 (citing Gov't Disc. at 22); *see also* Finney Aff. ¶ 25.  The CI

2   asked whether the crew was "in or out."  *Id.* ¶ 19.  Several unidentified voices confirmed they

3   were "in."  *Id.*  The group left for another location, where they would meet Agent Zayas.  *See id.*

4   ¶¶ 19–20.

5          When the group arrived at the Royce Farms BBQ in Stockton, Harper and three

6   others exited the Toyota, and Agent Zayas reviewed the robbery plan with them.  *Id.* ¶¶ 20–21.

7   He asked twice if they were prepared to follow through with it.  *Id.* ¶ 21.  The four men said they

8   were ready and understood the deal.  *See, e.g., id.* ("The UC asked the men if they were 'ok,'

9   meaning prepared to follow through with the planned home invasion robbery.  They indicated

10  they were ok. . . . [Zayas] asked the men if that was 'cool.'  No one answered in the negative.").

11  Agent Zayas said he wanted them to take his half of the cocaine to a nearby storage unit after the

12  robbery and asked them to follow him there.  *Id.*

13         All three cars, including defendant's Honda, left the BBQ with Agent Zayas.  *Id.*

14  When they arrived at Morada Self-Storage in Stockton, the Toyota followed Zayas inside.  *Id.*

15  The other two cars, including the defendant's, continued to a nearby bar.  *Id.*  The occupants of

16  the Toyota, including Harper, left their cars, and Agent Zayas told Harper to leave the cocaine in

17  his storage unit.  Mot. at 13 (quoting Video File 165); Opp'n at 5–6.  Harper asked, "Why can't I

18  give it to boy?[3]  Where boss man, where you gonna be at?  Why can't I . . . ," but Agent Zayas cut

19  Harper short and pretended to answer a phone call in Spanish.  Mot. at 13 (quoting Video File

20  165).  ATF agents then stormed in from a nearby storage unit and arrested Harper and the two

21  others with him.  Finney Aff. ¶ 22.

22         Soon afterwards, the defendant and the rest of the robbery crew were arrested

23  where they had parked at the bar.  *Id.* ¶¶ 23–26.  No weapons were found on the defendant, but he

24  was wearing a hooded sweatshirt and black knit hat, and had a black glove in his pocket.  *Id.* ¶ 33.

25  No items of evidence were recovered from the car the defendant was driving.  *Id.* ¶ 35.  However,

26  agents seized items from the two other cars and from the other members of the robbery crew,

27
   _____

28          [3] No additional information in the record clarifies Harper's reference to "boy."

1   including several guns, two knives, two bullet proof vests, gloves, black hoodies, and black

2   beanies converted to face masks. *Id.* ¶¶ 27–36. In codefendant Frank's *Mirandized* statement, in

3   which Frank admitted he met other members of the crew at Harper's house just before the Home

4   Depot meeting, Frank said the bulletproof vests, masks, gloves, and guns had been handed out to

5   the members of the robbery crew there. *Id.* ¶ 39.

6         B.    Procedural Background

7         On February 14, 2013, defendant Washington and eight others were indicted for

8   conspiracy to possess with intent to distribute at least five kilograms of cocaine in violation of

9   21 U.S.C. §§ 846, 841(a)(1) and conspiracy to commit a robbery affecting interstate commerce in

10  violation of 18 U.S.C. § 1951(a). Indictment, ECF No. 28. On January 28, 2015, defendant filed

11  the instant motion to dismiss the indictment. He contests the reverse sting as a violation of his

12  Fifth Amendment right to due process under the doctrine of outrageous government conduct.

13        On April 15, 2015, the court heard argument on the motion and after hearing

14  granted defendant leave to file a request to supplement his motion. ECF No. 279. The defendant

15  did not file a request, and his motion to dismiss was submitted on May 27, 2015. ECF No. 289.

16  On August 18, 2015, the government filed a notice of supplemental authority, identifying

17  *United States v. Pedrin,* __ F.3d __, No. 11-10623, 2015 WL 4879850 (9th Cir. Aug. 17, 2015),

18  which the court has now considered.

19  II.    LEGAL STANDARDS

20        A.    Motion to Dismiss

21        Under Federal Rule of Criminal Procedure 12(b), "a party may raise by pretrial

22  motion any defense, objection, or request that the court can determine without a trial on the

23  merits." Fed. R. Crim. P. 12(b). The court may consider extrinsic evidence on a motion to

24  dismiss the indictment, *United States v. Jones,* 542 F.2d 661, 664 (6th Cir. 1976), and "may make

25  preliminary findings of fact necessary to decide the questions of law presented by pre-trial

26  motions so long as the court's findings on the motion do not invade the province of the ultimate

27  finder of fact," *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986)

28

1    (quoting *Jones*, 542 F.2d at 664).  On appeal these findings are reviewed for clear error.

2    *United States v. Black*, 733 F.3d 294, 301 (9th Cir. 2013).

3               B.        Outrageous Government Conduct

4               A dismissal for outrageous government conduct is rooted in the Due Process

5    Clause of the Fifth Amendment, which provides no person shall "be deprived of life, liberty, or

6    property without due process of law."  U.S. Const. amend. V.  The Supreme Court has found

7    outrageous government conduct occurs when the actions of law enforcement officers or

8    informants are "so outrageous that due process principles would absolutely bar the government

9    from invoking judicial processes to obtain a conviction."  *United States v. Russell*, 411 U.S. 423,

10   431–32 (1973).  The Ninth Circuit has held the outrageous conduct doctrine permits a court to

11   dismiss an indictment when a defendant can demonstrate the government's conduct "'violates

12   fundamental fairness' and is 'so grossly shocking and so outrageous as to violate the universal

13   sense of justice.'"  *Black*, 733 F.3d at 302 (quoting *United States v. Stinson*, 647 F.3d 1196, 1209

14   (9th Cir. 2011)).  This is an "extremely high standard."  *Id.* (quoting *United States v. Garza-*

15   *Juarez*, 922 F.2d 896, 904 (9th Cir. 1993)).  "There is no bright line dictating when law

16   enforcement conduct crosses the line between acceptable and outrageous, so every case must be

17   resolved on its own particular facts."  *Id.* (citation and quotation marks omitted).

18              The Ninth Circuit has found it is outrageous for the government to generate "new

19   crimes merely for the sake of pressing criminal charges."  *United States v. Emmert*, 829 F.2d 805,

20   812 (9th Cir. 1987).  It is not outrageous, however, to infiltrate a criminal organization, to

21   approach individuals who are already involved in or contemplating a criminal act, or to provide

22   necessary items to a conspiracy.  *United States v. So*, 755 F.2d 1350, 1353 (9th Cir. 1985).  "Nor

23   is it outrageous for the government to use artifice and stratagem to ferret out criminal activity."

24   *Black*, 733 F.3d at 302 (citations and quotation marks omitted).

25              An outrageous government conduct claim calls on the court to undertake an

26   objective analysis that focuses on the government's actions.  *See So*, 755 F.2d at 1353.  Whether

27   the government has engaged in outrageous conduct turns on the totality of the circumstances.

28   *Black*, 733 F.3d at 304.  The Ninth Circuit has identified six factors to assist the court's analysis:

1    the defendant's known criminal characteristics; individualized suspicion of the defendants; the

2    government's role in creating the crime of conviction; the government's encouragement of the

3    defendants to commit the offense conduct; the nature of the government's participation in the

4    offense conduct; and the necessity for the actions taken by the government in light of the nature

5    of the criminal enterprise at issue.  *Id.* at 303–04; *see also Pedrin*, 2015 WL 4879850, at *3

6    (applying the *Black* factors).

7            C.      Reverse Stings

8            The Ninth Circuit has sanctioned reverse-string operations nearly identical to the

9    one in this case in three recent cases.  *See Pedrin*, 2015 WL 4879850, at *1–2; *Black*, 733 F.3d at

10   309–10; *see also United States v. Dunlap*, No. 14–50129, 2014 WL 6807733, at *620 (9th Cir.

11   Dec. 4, 2014) (reversing *United States v. Hudson*, 3 F. Supp. 3d 772, 775 (C.D. Cal. 2014)).  The

12   undercover agent in Black and Pedrin is the same agent as in the present case, Agent Zayas.  *See*

13   *Pedrin*, 2015 WL 4879850, at *1 (cataloging Zayas's exploits).  In *Black,* the government

14   recruited the defendants in a fictitious stash house sting operation in Arizona.  *Black*, 733 F.3d at

15   298–99.  The ATF sent an out-of-state CI to bars in an area with poor economic and social

16   conditions.  *Id.* at 299.  At the bar, the CI recruited one of the defendants to put a crew together to

17   rob a fictitious stash house.  *Id.*  The government created the fictional scheme and dictated the

18   method by which it would be carried out.  *Id.*

19           The *Black* court emphasized two major concerns with reverse stings, stressing they

20   were "not to be taken lightly."  *Id.* at 309.  One, the defendants were indicted largely because of

21   their responses to a government-created script.  *Id.* at 303 ("[T]he government could create a

22   criminal enterprise that would not have come into being but for the temptation of a big payday

23   . . . .").  Two, the reverse sting tactic cast a wide net based on socio-economic class, and the

24   government recruited the defendants knowing nothing about their criminal histories.  *Id.*

25   Consequently, the court scrutinized the initiation of the sting closely and placed a burden on the

26   government to show their conduct was justified.  *Id.*; *see also United States v. Briggs*, 623 F.3d

27   724, 730 (9th Cir. 2010) ("[We are] wary of such operations in general, and [are] inclined to take

28   a hard look to ensure that the proposed stash-house robbery was within the scope of [the

7

1  defendant's] ambition and means.").  Nonetheless, the court found its concerns mitigated by other

2  factors and upheld the defendants' convictions.  *Id.* at 307.

3       The mitigating factors included that the defendants repeatedly told Agent Zayas

4  they had engaged in similar criminal activity in the past.  *Id.*  One defendant bragged he had been

5  convicted of four felonies and seventeen misdemeanors, all involving drugs or guns.  *Id.*  Another

6  said he had just performed a stash house robbery and had the robberies "down to a science."  *Id.*

7  Moreover, after the initial contact the defendants joined the conspiracy with enthusiasm and

8  without any further inducement by the government.  *Id.*  The defendants who moved to dismiss

9  the indictment were recruited by codefendants rather than the government.  *Id.*

10      Although in *Black* Agent Zayas urged the defendants to quickly put a larger team

11 together and plan the details of the robbery, the court found no evidence the government engaged

12 in inappropriately coercive activity.  *Id.* at 308.  Rather, the court found the government's role

13 minimal.  *Id.* at 309.  Agent Zayas took the initiative in proposing the fictitious robbery, but later

14 provided no weapons, plans, manpower, or direction about how to perform it.  *Id.*  One defendant

15 proposed several robbery plans, saying he and his crew would rush in after Zayas to take the

16 occupants by surprise.  He also considered taking a hostage to the back room where the drugs

17 were.  *Id.* at 300.  The defendants obtained their own masks, gloves, and guns.  *Id.*

18      Finally, the court found more generally that stash house robberies are largely

19 unreported crimes that pose a great risk of violence in often violence-prone and gang-ridden

20 residential communities.  *Id.* at 309.  The reverse sting tactic creates a controlled scenario that

21 allows the government to "capture persons willing to commit such an armed robbery without

22 taking the final step of an actual home invasion."  *Id.*

23      Evaluating the totality of the circumstances, the court noted in the margin,

24 "[A]lthough the initial targeting of the defendants is troubling, it is counterbalanced by the

25 defendants' enthusiastic readiness to participate in the stash house robbery, by their

26 representations that they had committed stash house robberies in the past, by their independent

27 role in planning the crime and by the absence of government coercion or pressure."  *Black*, 733

28 F.3d at 306 n.8, *but see Black*, 733 F.3d at 313 (Noonan, J., dissenting); *see also United States v.*

1    *Black*, 750 F.3d 1053, 1054 (*Black II*)) (Reinhardt and Kozinski, JJ. dissenting from order

2    denying petition for reh'g en banc).

3                *Pedrin* is nearly *Black's* twin.  In *Pedrin*, Zayas targeted the nephew of a

4    confidential informant who expressed an interest in "work," that is, robberies.  2015 WL

5    4879850, at *1.  As in *Black* and this case, Zayas posed as a disgruntled drug courier and

6    proposed the robbery of a local cocaine stash house.  *Id.*  Zayas described the house, its

7    occupants, and the drugs, and left the rest to the defendants, who planned the details.  *Id.*  Before

8    the robbery, Zayas attempted to lure them to a storage unit, but the defendants became suspicious,

9    attempted to flee, and were captured.  *Id.* at *1–2.  On appeal of the district court's decision not to

10   dismiss the indictment, the Ninth Circuit applied the *Black* court's analysis.  *Id.* at *3–4.  The

11   court confirmed that "[w]hat the government learns only after the fact cannot supply the

12   individualized suspicion that is necessary to justify the sting if the government had little or no

13   basis for such individualized suspicion when it was setting up the sting."  *Id.* at *3.  But the

14   *Pedrin* defendants' conduct "gave rise to an inference that they had previously committed similar

15   crimes": they brought radios and scanners, assigned roles, and recruited others.  *Id.*  Moreover,

16   one defendant had reached out to the government for "work."  *Id.* at *4.  This was enough to lead

17   the Ninth Circuit to find again that the government's conduct was not outrageous despite its

18   repeated "concerns about the risks of government overreaching inherent in fictitious stash house

19   sting operations."  *Id.* (quoting *Black*, 433 F.3d at 310 n.13).

20               The defendant cites *Hudson*, 3 F. Supp. 3d at 775 and *United States v. Roberts*,

21   No. 13-cr-00751, slip op. (C.D. Cal., May 30, 2014), in support of his argument that other federal

22   district courts applying the *Black* factors have dismissed indictments in similar circumstances.

23   Mot. at 15.  Neither *Hudson* nor *Roberts* is binding on this court.  *Dunlap* overturned *Hudson*

24   upon finding its facts were nearly identical to those in *Black*.  *Dunlap*, 593 F. App'x at 620 (once

25   the government proposed the robbery, the defendants responded with enthusiasm, played an

26   independent role in planning the robbery, and provided the resources to execute their plan).  The

27   defendant argues the present case is distinguishable from *Black* and *Dunlap*, but as discussed

28   below, the court disagrees.  In addition, in *Roberts* the court found the defendants had played no

1    role other than to respond to the government's script.  *Roberts*, slip op. at 8.  The facts here are

2    too similar to *Black* and *Pedrin* to distinguish it in this way.

3    III.    ANALYSIS

4          A.    Initiation of the Reverse Sting

5          The first three *Black* factors—individualized suspicion, the government's

6    knowledge of the defendant's criminal history, and the government's role in creating the crime of

7    conviction—are relevant in evaluating the initiation of the reverse sting operation.  Individualized

8    suspicion of wrongdoing is an important consideration, but can be outweighed by other factors.

9    *See Black*, 733 F.3d at 304.  Whether the government approached a defendant first or proposed

10   the criminal enterprise affects a court's evaluation.  *Pedrin*, 2015 WL 4879850, at *3–4; *Black*,

11   733 F.3d at 305.

12         The same kind of facts the Ninth Circuit found troubling in *Black* are present here.

13   The government concedes it had not identified Harper or the other crew members as suspects, and

14   did not know their criminal histories before the sting began.  *See* Opp'n at 11.  The CI did not

15   limit his effort to identify participants to people he knew were likely prospects.  The ATF created

16   from whole cloth the story of the fictitious stash house, the amount of cocaine involved, and the

17   specter of armed men guarding the house.

18         The defendant argues the concerns raised by these factors are not offset because,

19   unlike in *Black*, the robbery crew never discussed or bragged about previous criminal

20   involvement.  Mot. at 23–24.  But the record discloses that after the CI initiated a conversation

21   with Harper, Harper asked the CI if he knew of any robberies Harper and his associates could

22   execute.  This suggests Harper, at least, was contemplating criminal activity.  *See Emmert*, 829

23   F.2d at 812 (where target "expressed interest in receiving a portion of the finder's fee in exchange

24   for brokering cocaine . . . [h]e was therefore contemplating criminal activity and further

25   investigation was appropriate.").  In addition, defendant Washington was recruited by Harper, not

26   by the government.  His presence at the initial meeting, based on communications with Harper

27   alone, suggested he too voluntarily contemplated criminal activity.  *See Black*, 733 F.3d at 307

28

1   (the court's concerns were mitigated because the defendants were recruited by other co-

2   defendants, not the government, and showed enthusiasm once recruited).

3           Because the government has offered no audio or video recording evidence to show

4   how defendants were recruited before the first meeting with Agent Zayas, defendant argues it is

5   unknown whether the CI used coercive tactics to gain Harper's interest.  Mot. at 20–21.

6   Defendant notes the disparities between Agent Zayas's original report and Agent Finney's

7   affidavit: Agent Zayas did not describe Harper as someone involved in stash house robberies.

8   The ATF followed the same procedure here as in *Black*, recording only later conversations with

9   Agent Zayas and not with the CI.  *See* 733 F.3d at 299 & n.4.  While a recording of the first

10  contact with the CI would be preferable, precedent teaches it is enough here that the meetings

11  with Agent Zayas were recorded.

12          Even assuming Harper did not suggest a robbery to the CI and the CI did not

13  describe Harper as "an individual involved in stash house robberies," other circumstances weigh

14  in the government's favor in light of the Ninth Circuit precedent.  During the meetings with

15  Agent Zayas, the robbery crew expressed comfort with committing the stash house robbery.

16  When Agent Zayas first described his proposal, Harper told him, "you ain't got to say no more"

17  and he had "nothing to worry about."  Harper expressed confidence when Agent Zayas said two

18  men guarded the stash house because Harper had expected four to be present.  Defendant

19  Washington was present at these meetings, all indications are he knew what Zayas was saying,

20  and he did not object or leave.  Together, these representations are sufficient for the government

21  to have concluded the men were likely stash house robbery participants.

22          That defendant Washington himself had no prior criminal history to speak of and

23  did not participate in any major way in the meeting, does not salvage his motion.  In *Black*, the

24  Ninth Circuit found that the relevant factors need not be examined separately with respect to each

25  individual defendant, as much as that principle appears to be in tension with the notion of

26  individual suspicion.  *Black*, 733 F.3d at 307 n.11 ("The question before us is whether the

27  government's conduct was outrageous in conducting this criminal investigation.  As long as the

28  government's investigation was initiated and performed tolerably with respect to the operation as

1  a whole, it would undermine law enforcement's ability to investigate and apprehend criminals if

2  its otherwise acceptable conduct became outrageous merely because an individual with no known

3  criminal history whom the government did not suspect of criminal activity joined the criminal

4  enterprise at the last minute at the behest of codefendants.").

5          B.      Post-Initiation Conduct

6          The next two *Black* factors are relevant to analyzing the government's conduct

7  once the sting had begun: the government's encouragement and participation in the crime.  The

8  extent to which the government encourages a defendant to participate in a crime is an important

9  consideration, albeit of lesser concern than pressure or coercion.  *Black*, 733 F.3d at 308.  The

10 duration, nature, and necessity of the government's participation in the criminal enterprise also

11 require scrutiny.  *Id.* at 308–09.  Government conduct is more likely to be outrageous the longer

12 government agents' participation continues, the more agents actively participate in the

13 defendants' conduct, and the less the defendants rely on the government's expertise or resources.

14 *Id.*  At the same time, due process claims have been successful generally only when the

15 government essentially manufactures the entire crime.  *United States v. Bogart*, 783 F.2d 1428,

16 1436 (9th Cir.), *vacated in part on other grounds sub nom. United States v. Wingender*, 790 F.2d

17 802 (9th Cir. 1986); *see also Greene v. United States,* 454 F.2d 783, 786–87 (9th Cir. 1971)

18 (finding outrageous government conduct where government agent contacted defendant, urged him

19 to run illegal liquor still, provided materials for still, employed veiled threats to convince

20 defendant to keep still running, and was sole customer).

21          Here, there is little evidence of coercion or pressure.  In contrast to *Black*, Agent

22 Zayas did not encourage Harper to increase the size of his robbery crew.  Harper recruited

23 defendant Washington and the rest of his crew independently.  Defendant argues Agent Zayas

24 encouraged the crew to bring guns and shoot the guards by describing two fictitious men guarding

25 the house, emphasizing they had guns, and expressing his disdain for them.  Mot. at 25–26.  But

26 in light of *Black*, the inclusion of these details lends further support to Agent Zayas's conclusion

27 that the men were likely stash house robbery participants.  *See Black*, 733 F.3d at 300 (Zayas

28 "purposely chose details that demonstrated a particularly high potential for danger and violence to

12

ensure that only individuals who are truly involved in this type of crime would agree to it."). The precedent also forecloses defendant's argument that Zayas used economic coercion by recruiting young men from low-income, minority communities and baiting them with an easy opportunity to obtain cocaine worth hundreds of thousands of dollars. *See Emmert*, 829 F.2d at 812 ("[L]arge sums of money are . . . necessary to create a credible cover for undercover agents. . . . [T]he large finder's fee was not intended as bait for college students, but as a method to smoke out a supplier capable of selling large quantities of cocaine.").

Defendant argues the government played the crucial leadership role; without Zayas, he says Harper's crew lacked the ability to commit the robbery. Mot. at 28. The duration of the government's sting operation was only a few days. Although the government is entirely responsible for proposing the fictitious house robbery, and Agent Zayas largely led the meetings with the robbery crew, the government's role for the remainder of the operation was more passive than active. During their meetings with Agent Zayas, members of the crew proposed that Zayas leave the front door unlocked. Led by Zayas, crew members also developed the plan to push Agent Zayas to the ground and rush the guards when they entered the house. The crew also had their own pre-robbery meeting, without the government's knowledge or attendance. At their meeting, they assigned roles to different crew members, including who would drive and who would knock on the stash house door. They distributed bulletproof vests, masks, gloves, and guns to members based on assigned roles, planned how many men were needed, the weapons they would use, the vehicles each would use, and how to dress; they needed no supplies from the government. Neither did the government arrange for the drugs' distribution after the robbery. Again, given the Ninth Circuit's precedent, these facts support the constitutionality of the indictment. *See Pedrin*, 2015 WL 4879850, at \*3; *Black*, 733 F.3d at 309; *Dunlap*, 593 F. App'x at 621; *Emmert*, 829 F.2d at 813.

Finally, defendant argues Zayas acted outrageously when showing Harper the storage shed by cutting Harper off. He argues Harper was about to renounce his involvement. Mot. at 31. Rather than expressing reservations about committing the robbery, however, Harper's words suggest it is more likely he had begun to suspect Agent Zayas's true identity, or at least

1    that something was up, in questioning Zayas's instructions: "Why can't I give it to boy?  Where

2    boss man, where you gonna be at?  Why can't I . . . ."  Video File 165.  Moreover, by that time,

3    defendants had repeatedly expressed their comfort with the plan and had arrived ready to execute,

4    equipped with getaway vehicles, guns, masks, and bullet proof vests.

5            C.       Nature of the Crime Being Investigated

6            Under the final *Black* factor, courts consider the need for the chosen investigative

7    technique in light of the challenges of investigating and prosecuting the type of crime in question.

8    *Black*, 733 F.3d at 309; *see also United States v. Twigg*, 588 F.2d 373, 378 n.6 (3d Cir. 1978)

9    ("[I]n evaluating whether government conduct is outrageous, the court must consider the nature

10   of the crime and the tools available to law enforcement agencies to combat it." (citing *Hampton v.*

11   *United States*, 425 U.S. 484, 491 (1976) (Powell and Blackmun, JJ., concurring in the

12   judgment))).

13           Defendant Washington argues countervailing policies should control the court's

14   analysis of this factor.  Mot. at 33–34.  In particular, he argues the court should adopt the logic of

15   the dissent in *Black*, which argues that fictitious stash house stings provide greater security to real

16   stash houses by eliminating a potential stash house robber and deterring other criminals from

17   joining robberies.  *Black*, 733 F.3d at 317 (Noonan, J., dissenting) (quoting *United States v.*

18   *Kindle*, 698 F.3d 401, 414 (7th Cir. 2012) (Posner, J. dissenting)).

19           But it is the majority opinion in *Black* to which this court must hew:  "stash house

20   robberies are largely unreported crimes that pose a great risk of violence in residential

21   communities."  *Black*, 733 F.3d at 309.  In this view, the reverse sting tactic helps avoid the risk

22   of violence by "creating a controlled scenario that unfolds enough to capture persons willing to

23   commit such an armed robbery without taking the final step of an actual home invasion."  *Id.*

24           D.       Totality of the Circumstances

25           The government's initial targeting of the defendants without any individualized

26   suspicion gives this court pause.  If the court were writing on a blank slate, it would be inclined to

27   grant defendant's motion.  As other courts have noted, including the circuit in *Black* itself,  the

28   reverse sting tactic is valid when used to interfere with an ongoing criminal enterprise in large

14

1    part because it can avoid violence through a measure of control.  *See Black*, 733 F.3d at 309.  But

2    the government is not preventing certain violence when it imagines a fictional scheme and

3    recruits a person who then recruits others, including defendant Washington, who otherwise might

4    not have committed such a crime.  Moreover, "[i]n an age of widely-reported unequal

5    enforcement of the criminal laws," suspicionless recruitment "is an open invitation to racial

6    discrimination."  *Id*. at 1055.  Most sobering, the reverse sting tactic as implemented in this case

7    allows the government to set the parameters defining a defendant's exposure to criminal

8    penalties, with the potential of triggering even mandatory minima arbitrarily.  *See id.*, 733 F.3d at

9    317 (Noonan, J., dissenting).

10         All of that said, the government's conduct here toes the constitutional side of the

11   line drawn by the majority in *Black*.  Defendant along with other members of Harper's crew was

12   ready to commit a robbery.  He willingly joined the crew, which with Harper's leadership played

13   an independent role in planning the crime and providing its own supplies, without repeated

14   prompting from the government.  The crime the crew agreed to commit carried, on its face, a risk

15   of violence, a risk no crew member attempted to mitigate or offset.  Under these circumstances,

16   Ninth Circuit precedent dictates that the reverse sting operation in this case does not constitute

17   outrageous government conduct.

18   IV.    CONCLUSION

19         The motion is DENIED.  This order resolves ECF No. 257.

20         IT IS SO ORDERED.

21    DATED:  September 17, 2015.

22

23

24   _____
     UNITED STATES DISTRICT JUDGE

25

26

27

28